Harry H. Spitzer v. Commissioner.
Harry H. Spitzer v. Commissioner
Docket No. 4373.
United States Tax Court
1945 Tax Ct. Memo LEXIS 181; 4 T.C.M. (CCH) 562; T.C.M. (RIA) 45189; May 31, 1945
*181 David Baron, Esq., 208 N. Broadway, St. Louis 2, Mo., for the petitioner. Loyal E. Keir, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges respondent's determination of gift taxes for the year 1940 in the amount of $2,303.44. The only question involved is the value of the subject of the gift, which was 75 shares of the common stock of Forest City Manufacturing Company. Petitioner returned a value of $186 per share, but now admits that this was due to an erroneous computation, and that the value is $286 per share, being the book value of the stock as of the end of the year 1939. Liability by reason of this adjustment is admitted by petitioner. The case was submitted upon a stipulation of facts and evidence adduced at the hearing. Those facts hereinafter appearing which are not from the stipulation are facts otherwise found from the record. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner resides in St. Louis, Missouri, and during the taxable year and for many years prior thereto was president and one of the executive stockholders in the Forest City Manufacturing *182 Company, a Missouri corporation with its principal offices in St. Louis, hereinafter sometimes called the company. On October 15, 1940, petitioner made a gift to his wife, Anna Spitzer, of 75 shares of the common capital stock of the company. The company was organized prior to 1918 and in 1919 all of its capital stock was purchased by petitioner who became president, Simon Spitzer who became vice president, and A. H. Sincoff who became secretary. These men are still the executive officers of the company and together with their respective families own substantially all of its capital stock. The capital stock of the company consists of both common and 7 percent preferred, each having a par value of $100 per share. Prior to the purchase in 1919, the company had a capitalization of $12,000, which in March, 1919, was increased to $27,000 and in 1920 to $100,000 all common. In 1927 the capital stock was increased by the addition of $50,000 of preferred stock, all of which was subscribed by the executive officers. In 1929 capital stock was increased to $200,000, represented by 1,000 shares of common stock and 1,000 shares of preferred. In 1932 capital was increased to $300,000 by increasing *183 the authorized preferred to $200,000, of which $50,000 was actually paid in cash so that the total outstanding capital after the increase was $250,000, of which $100,000 in par value was common stock and $150,000 in par value was preferred stock. In 1933 $17,500 preferred stock was declared as a dividend on preferred to take care of accrued unpaid dividends on preferred and $32,500 of preferred stock was declared as a dividend on common stock. This resulted in a capitalization of $300,000, of which $100,000 was common and $200,000 was preferred. This represents the present capitalization. The Company is a dress manufacturing concern and prior to 1939 was engaged in manufacturing cotton wash house-dresses and became one of the largest manufacturers of wash dresses in the United States. In 1939 it ceased manufacturing wash house-dresses and from then on manufactured and sold junior misses dresses exclusively. The company's product is sold to the retail trade principally by women's specialty and department stores. No stocks of companies engaged in a business similar to that of the company are listed for trading purposes with a stock exchange or are traded locally in over-the-counter *184 transactions. The women's ready-to-wear business is subject to wide fiuctuation. The company designs each year lines of dresses which are made up semi-annually. The company has developed a good name but if they made a mistake in designing one of the lines of dresses, the result might be a disastrously bad season from which it might be difficult to recover. Businesses involving women's styles are very hazardous and, the best of companies do not know what it is that causes a woman to buy an article. From the going quotations for other securities on similar types of business in St. Louis and in other parts of the country, both over-the-counter and on the market, in 1940, it was most usual to find securities selling at five and six times their average earnings over a five-year period. There was a recent public sale in St. Louis of the stock of the Curlee Clothing Company who were men's clothing manufacturers, a more stable business than women's clothing. The stock was purchased by investment bankers and offered to the public. The Curlee Company had been in business since 1901 and had a good name, record, and trade-mark. There was Class A and Class B common stock; the Class A was *185 to receive a $2.00 non-cumulative preferential dividend, after which both classes shared alike. The stock was purchased at $23.50 a share by investment bankers. Its earnings had been as follows: 1943
$4.13
1942
5.41
1941
5.95
1940
3.57
1939
4.75
1938
1.99
1937
2.48
The price at which the stock was bought by the bankers was about eight times the average earnings of the pre-war years and about 66 percent of the book value or of the net worth. The stock was resold to the public at $26.00 a share for the Class A and $24.00 a share for the Class B. In 1940 the stock of Consolidated Retail Stores, a successful consolidation of retail stores in women's wearing apparel, was sold on the New York Exchange at $3.00 a share which was less than its book value. It was paying 30 cents in dividends and was earning $1.00 a share. That stock was selling in November, 1944, for $9.00 a share. The war having started in the fall of 1939, and by June, 1940, German successes having been marked, the markets were uncertain and unsettled. The listed markets collapsed in May of 1940, but recovered somewhat during the summer. The European picture continued clouded during the *186 summer and fall of 1940. The company's net sales, officers' salaries, dividends on common stock, net profits after taxes, and amounts available for dividends on common stock for the years 1930 to 1940, inclusive, are as follows: Amount
Year
Sales less
Dividends
Net Profit
Available for
Ended
Discount and
Officers'
on
After
Dividends on
Allowances
Salaries
Common Stock
Taxes
Common Stock
12/30/1930
$1,927,081.78
$ 72,000.00
$ 16,103.16
$ 9,103.16
1931
1,725,615.00
72,000.00
(36,968.01)L
(36,968.01)L
1932
2,079,824.96
72,000.00
45,873.12
28,273.12
1933
2,364,250.43
72,000.00
* 32,500.00
97,386.56
85,136.56
1934
2,503,152.76
72,000.00
112,934.62
98,934.62
1935
2,071,537.17
72,000.00
18,000.00
38,563.98
24,563.98
1936
2,414,294.07
72,000.00
22,410.61
8,410.61
1937
2,762,770.83
90,000.00
70,000.00
63,969.20
49,969.20
1938
2,695,038.92
90,000.00
88,151.34
74,151.34
1939
3,238,090.12
108,000.00
90,000.00
106,773.44
92,773.44
1940
4,414,073.73
120,000.00
** 75,000.00
128,244.73
114,244.73
*187 Balance sheets of the company as of December 1, 1939, and December 31, 1940, are as follows: FOREST CITY MANUFACTURING CO. BALANCE SHEET DECEMBER 31, 1940 ASSETS
Current
Cash
$ 31,414.23
Customer's Accounts Receivable
$479,354.00
Less Reserves: Discounts Allowable
$36,774.68
Doubtful Accounts
10,000.00
46,774.68
432,579.32
Inventory of merchandise, valued at the lower of cost or
market: Piece goods, trimmings and findings
205,229.30
Finished and partly finished dresses
101,363.92
306,593.22
$770,586.77
Fixed Assets: Machinery and Fixtures, at cost
138,269.94
Less Reserve for Depreciation
79,601.54
58,668.40
Trade Marks, at book value
745.26
59,413.66
Other Assets: Cash surrender value of $450,000.00 insurance on the lives
of officials
48,739.20
Miscellaneous Accounts Receivable
Officers
34,388.04
Employees and others
5,777.51
40,165.55
Deferred operating expenses
3,179.12
92,083.87
$922,084.30
FOREST CITY MANUFACTURING CO. BALANCE SHEET DECEMBER 31, 1940 LIABILITIES AND NET WORTH
Current Liabilities: Notes payable to banks
$150,000.00
Accounts payable to trade creditors
89,513.25
Other accounts payable and accrued expenses
54,065.35
Accrued income and social security taxes
88,586.20
Balance payable to stockholders
14,390.68
$396,555.48
Net Worth: Capital Stock: Authorized and issued: 7% cumulative preferred, 2,000 shares of $100.00
each
$200,000.00
Common: 1,000 shares of $100.00 each
100,000.00
300,000.00
Surplus.
Balance, Dec. 31, 1939
186,284.09
Add - Net Profit for the year ended Dec. 31, 1940
128,244.73
314,528.82
Deduct - Dividends on the capital stock paid in cash
during the year: Preferred 7%
$14,000.00
Common, $75.00 per share
75,000.00
89,000.00
225,528.82
$525,528.82
$922,084.30
*188 FOREST CITY MANUFACTURING COMPANY Balance Sheet at December 31, 1939 Assets
Current Assets: Cash in bank and on hand
$ 9,777.65
Notes and accounts receivable: Notes receivable
(collected January 4, 1940)
$ 25,000.00
Customers' accounts receivable
334,750.34
$359,750.34
Less - Reserves: Discounts allowable
$25,612.47
Doubtful accounts
10,000.00
35,612.47
324,137.87
Inventory of merchandise, valued at the lower of cost
or market: Piece goods, trimmings and findings
$115,676.23
Finished and partly finished dresses
115,108.85
230,785.08
$564,700.60
Fixed Assets: Machinery and fixtures, at cost
$118,219.86
Less - Reserve for depreciation
70,220.51
$ 47,999.35
Trademarks, at book value
443.00
48,442.35
Other Assets: Cash surrender value of $300,000.00
Insurance on the lives of officials
$ 41,733.12
Miscellaneous accounts receivable: Officers'
$ 11,129.51
Employees and others
10,503.57
21,633.08
Deferred operating expenses
3,710.85
67,077.05
$680,220.00
FOREST CITY MANUFACTURING COMPANY Balance Sheet at December 31, 1939 Liabilities and Net Worth
Current Liabilities: Accounts payable to trade creditors
$110,959.02
Other accounts payable and accrued expenses
35,457.33
Accrued income and social security taxes
36,600.99
Balances payable to stockholders
10,918.57
$193,935.91
Net Worth: Capital Stock: Authorized and issued: 7% Cumulative preferred, 2,000 shares of
$100.00
each
$200,000.00
Common, 1,000 shares of $100.00 each
100,000.00
$300,000.00
Surplus: Balance, December 31, 1938, per books of account
$183,510.65
Add - Net profit for the year ended December
31, 1939
106,773.44
$290,284.09
Deduct - Dividends on the capital stock paid
in cash during the year: Preferred, 7%
$14,000.00
Common, $90.00 per share
90,000.00
104,000.00
186,284.09
486,284.09
$680,220.00
*189 As of December 31, 1940, the company carried insurance on the life of petitioner in the face amount of $100,000 with a cash value of $16,619.21. An agreement dated June 1, 1940, between the company and petitioner, Abraham H. Sincoff, and Simon Spitzer recited the company's capitalization and listed the holders of its outstanding stock as follows: Name
Preferred
Common
Abraham H. Sincoff Family
Abraham H. Sincoff
35
310 1/12
Gertrude M. Sincoff, wife
440
Philip Lee Sincoff, child
40
Julian Joseph Sincoff, child
40
Barbara Mae Sincoff, child
40
Simon S. Spitzer Family
Simon S. Spitzer
310-1/12
Rose Spitzer, wife
615
Maxine Spitzer, child
Melva Jane Spitzer, child
Harry H. Spitzer Family
Harry H. Spitzer
90
310-1/12
Anna Spitzer, wife
550
Jerome Spitzer, child
50
Lucille Spitzer, child
50
Robert Spitzer, child
50
Independent Stockholders
Louis B. Spitzer
42     Max B. Landau
27-3/4 2,000
1,000      It also noted that the executive stockholders were the controlling directors and executive officers of the company and that they deemed it to the best interests of the company and its stockholders "that the *190 survivors or survivor of the executive stockholders should continue as the controlling stockholders, directors and executive officers thereof if the corporate business is to be continued after the death of any of them." The agreement provided that on the death of one of the executive stockholders the company was to purchase from their personal representatives all the stock owned by that executive stockholder and his wife and lineal descendants or the company was to be liquidated and dissolved. Determination as to which of the alternatives was to be pursued was to be made by the surviving executive stockholders within two months after the death of the deceased executive stockholder. If it was decided to purchase the stock, consummation was to be within three months after the death of the executive stockholders. The purchase price of the preferred stock was to be its par value, plus accumulated and unpaid dividends, plus interest at the rate of 7 percent from the last dividend date to the date of purchase. The purchase price of the common stock was to be its book value under the regular audit of the last preceding fiscal year if the death was during the first 10 months of the fiscal *191 year, or the audit of the current fiscal year, if the death occurred during the last two months of the fiscal year. It was provided, however, that if the book value as of the close of the last fiscal year is used, such value is to be adjusted by giving consideration to any substantial changes in capital account taking place between the close of the preceding fiscal year and the date of the purchase, including the maturity of corporate life insurance, by being reduced to the extent of the dividend paid or payable in the interim period, and by being increased with interest for the interim at the rate of 7 percent per annum on the book value before adjustment. Operating results and inventory fluctuations during the interim period were not to affect the price to be paid. The fiscal year at the time of the execution of the agreement was the same as the calendar year. The purchase price provided in the agreement was to be paid in cash at least to the extent of the proceeds of life insurance contracts owned by the company insuring the life of the executive stockholder who died, first in payment of the purchase price of the common stock and then in payment of the purchase price of the preferred *192 stock then held by the widow of the deceased executive stockholder; and third, in payment of the purchase price on the balance of the preferred stock. Any unpaid balance was to be represented by unsecured notes of the company payable in six semi-annual installments over a period of three years from the date of the purchase, bearing interest of 6 percent, subject to prepayment and acceleration on default. If the surplus of the company were not sufficient to permit the lawful purchase of all of the stock, the company was permitted to make purchases to the extent lawful and the surviving executive stockholders were to purchase the balance on the terms provided for the company. Similar provisions are set out in the contract on the death of the second executive stockholder, except that if the second executive stockholder dies within one year of the death of the first executive stockholder and it is decided to liquidate and dissolve the company, the unpaid notes issued on the death of the first executive stockholder could be paid with stock of the corporation valued at the same prices determined when the notes were issued. This was in order that there would be no preference in the treatment *193 of those whose stock rights were converted into creditors' rights within one year. Should liquidation be decided upon, provision was made for orderly liquidation; and no portion of the assets could be sold directly or indirectly to the surviving executive stockholders or their families without the consent of the survivors of the deceased executive stockholder. By the agreement the voting power of the common stock of the corporation was placed in the hands of the executive stockholders; no holder of common or preferred stock other than the executive stockholders was to have the right to pledge or encumber their stock without the specific written consent of the executive sockholders. After first obtaining the approval of all the existing executive stockholders, the company or any of the executive stockholders were to have the optional right to purchase any or all of the common or preferred stock held by any stockholder or stockholders at any time on notice by registered mail. The price for the preferred stock was to be in cash in the amounts above set forth and as to the common stock the book value at the close of the preceding fiscal year, adjusted for changes in book value during *194 the year of purchase and dividend action during that year. The agreement further provided that if any executive stockholder for reasons other than illness of less than one year does not continue as an acting officer of the company, the company or the other executive stockholders were to have the optional right to purchase all but not part of the common stock and all or any part of the preferred stock held by the inactive executive stockholder or his family at prices identical with those last above mentioned. After the death of two executive stockholders and the obligations arising in connection with their deaths are complied with, the agreement was to be no longer operative. By mutual agreement of termination signed by the existing executive stockholders the agreement was to be no longer effective. Such termination could not be made so as to affect the rights of any stockholders arising at the time of the death of an executive stockholder. The agreement could also be terminated by a written irrevocable request of one of the executive stockholders to the other executive stockholders and to the company at least two years prior to the effective date of such termination. All the *195 shares of stock subject to the agreement were to bear notice of that fact. Signatories to the agreement were, in addition to the executive stockholders, Rose Spitzer, Anna Spitzer, Gertrude M. Sincoff, Max B. Landau, Louis B. Spitzer, Jerome B. Spitzer, Barbara Mae Sincoff, Philip Lee Sincoff, and Julian Joseph Sincoff. As of October 15, 1940, petitioner, Simon Spitzer, and A. H. Sincoff were 51, 54, and 46 years of age, respectively. Their life expectancies, according to the American Experience Table of Mortality, were 20, 18, and 23 years, respectively. The fair market value for gift tax purposes of the stock in question as of October 15, 1940, was not less than $500 per share. Opinion On the most conservative application of the facts shown by the record, it seems evident that petitioner's proposed valuation of the gift involved here could not possibly be considered adequate. Average earnings available for the common stock for the five years ending with 1940, the year during which the gift was made, were approximately $68 per share and, if capitalized at the figure of six times earnings at which the record indicates that stock of companies in similar lines of business actually *196 changed hands at about the relevant time and place, would give a value of $408 a share. Likewise, the 1940 balance sheet indicates that at the middle of October, the time of the gift, prior to the declaration of the annual dividend, but when it may be assumed (in the absence of a contrary showing) that most of the year's earnings had been secured, book value was in the neighborhood of $400 a share even allowing for the payment of the preferred dividend for the entire year. But there are many considerations which indicate that such figures would fail to account for factors which might be expected to add value to the stock. For example, the balance sheet carries fixed assets at cost, less depreciation, resulting in a figure of less than half their original cost. There is no evidence that the actual value of the property did not considerably exceed such conservative figuring. Trade-marks are valued at the nominal amount of $745. No effort was made to show their actual value, but their inclusion in the balance sheet indicates that they may well have been worth a substantial amount. Without giving any consideration to goodwill, it thus appears that the book figures are probably lower *197 than a mere liquidation would assure to the common stockholders. Again the ratio of current assets to current liabilities is good, the company's cash position apparently adequate, and the dividend record attracive. Taking the same five-year period these averaged about $47 a share, or almost 10 percent on respondent's proposed valuation of $500 for each of the common shares. Taking into consideration these and other factors governing value, and bearing in mind the lack of evidence as to the circumstances of the companies whose shares are said to have been dealt in at the six-times-earnings figure, we think it impossible to say that respondent's determination was excessive. There remains for consideration the effect on these figures of the so-called restrictive agreement. An examination of its provisions, however, raises a serious doubt that it would have an effect on the stock sufficient for us to say that the price otherwise obtainable could not be secured. In the hands of petitioner the stock was entirely free of any restriction whatever upon its disposition. The situation is consequently easily distinguishable from cases where an option price has been held to limit the value. *198 ; ; . The terms of the agreement are such that it might become necessary to ascertain the identity of a prospective purchaser before it could be said with certainty at what figure the purchaser could afford to deal. But clearly petitioner's associates, the other so-called executive stockholders, could buy the stock and obtain protection rather than menace from the contract. It is difficult to believe that the petitioner would become a willing seller of the stock at a price below its intrinsic value merely because in the hands of some hypothetical purchaser there could exist a hazard to which he himself was not subject. As a matter of fact petitioner could eliminate even that disadvantage by a collateral agreement to withhold the consent on his part to any enforced purchase which under the terms of the contract was an essential prerequisite. That he accompanied the gift by no such express agreement rather demonstrates that the value of the property in the hands of the donee, a natural object of petitioner's *199 bounty, was in fact no less than in his own. Cf. ; . Under all the circumstances, we are not persuaded that any price at which the stock would change hands between petitioner as a willing seller and any willing buyer in a position to offer full value for the property would be so far below intrinsic value as to result in a figure less than the amount determined by respondent. ; , affirmed (C.C.A., 2nd Cir.), . Decision will be entered for the respondent. Footnotes
*. This dividend was paid in preferred stock. ↩
**. The dividend paid in 1940 was declared and paid on December 19, 1940.↩